Good morning. Welcome to the Illinois Appellate Court First District. My name is Sanjay Taylor. I'm the presiding justice of the Sixth Division of the First District Appellate Court. I'm joined this morning by my colleagues Justice Carla Walker to my left and Justice Celia Gamrath to my right. If I can have counsel introduce yourself and which side you represent, Mr. Becker. Okay, Mr. Becker, how much of your 25 minutes would you like to save for rebuttal? Okay, thank you. And counsel. Good morning, Ms. Burns. Okay, Mr. Becker, we'll begin. May it please the court. I just want to give a little factual background on the case. In this particular case, the defendant and the decedent were in a dating relationship for several years prior to the incident in which this criminal case arose. They were out for New Year's festivities. They went to several restaurants and pubs on the night in question. They did some dancing together and then they left from the restaurant after the bell fell in New York for New Year's. They then drove around and they'd had some alcohol during the evening. So there was a lengthy drive in the defendant's vehicle. And during most of this time, the decedent was sleeping or resting. And what happened is at a certain point in their drive, she awoke and she had to go to the restroom. So she sat on the console of the truck and she urinated into the console. And then she tried to get out of the car while they were driving at about 65 miles per hour. The defendant then pulled her back into the car and said, what are you doing? Please stop. And at that point, according to the defendant, she just started attacking him. She screamed at him. She started hitting him with a water bottle. Also, she threw coffee mocha all throughout the vehicle that got on his glasses and on the windshield. In addition, she tried to grab the steering wheel, according to the defendant, and he lost control for a certain amount of time. Then he got her back into the seat. And at that point, she yelled, die, die. And he said he just reflexively pulled a gun that he had in the car out and he shot her. According to the police, there were three shots that were fired. And after that, he pulled over the car. He called his son and said that I had just shot the woman that I loved. And then he said, I'm going to commit suicide. And the son said, do not do that. Call Deborah, who was another family friend. He called Deborah and she informed him, take the woman right to the hospital immediately and call the police. He made a 911 call and the police told him to wait there. He did. He unloaded the gun and he waited for them to come. They then came to the scene and arrested him. He came out. He was compliant during the entire time. At this point, investigators came from the state police to collect forensics. There was some certain stains on the decedent's face. This is what one of the issues in the case is that the Illinois State Police did not collect stains. In addition, there were two women at the restaurant earlier that evening, and the decedent had told them basically that her boyfriend, this is my stalker. And so there was an issue that also we will discuss today regarding that as to whether the judge should have allowed that in for evidence. So that's a bit of a factual background in the case. And with that, if I may, I'd like to turn to my argument. The first issue I would like to address is whether the court erred in denying a instruction on the destruction of physical evidence, especially in light of the fact the police violated the Illinois Preservation of Evidence statute. This appears to be a case of first impression with this court. Interestingly, in People v. Grant, which was a 2022 decision from the Illinois Supreme Court, the court did address section 116-4, which is Illinois's Preservation of Evidence statute. However, in that particular case, they declined to make a decision on whether, in fact, a person who has a situation should be able to get an instruction on the adverse inference for destruction of evidence. That issue is squarely presented in this case, and so that's to which I will now turn. Counsel, did your client argue this at trial, this statute in particular? Correct. The defense did not raise this particular statute at trial. And so what does that do for us? Is this deemed forfeiture or waiver, or is it an issue that's right for us to discuss? Yes, I think this is right because they did make a request for an instruction for destruction of evidence. In addition to that, they preserved that in their for the new trial, so the issue is properly preserved. Also, this falls under what the Supreme Court would say the constitutionally guaranteed right to access to evidence, so it had a constitutional basis. On appeal, I have argued that an additional basis as to why the instruction should be granted is we do also have an Illinois Preservation statute. So this was not necessary for their argument in the trial court, but I believe it does support the argument as to why the trial court should have granted the instruction in this case. And to be clear, the evidence we're talking about is the dark brown stain, red, brown, red, whatever color it was, stain on the victim's cheek, correct? That is correct, Justice. So what happened in the case when they were looking at her, there were some photographs that were taken when they were assessing the evidence in the truck, and there was a stain on her face, and so an issue actually arose here at trial, and this is how the jury instruction issue came up, is that one of the officers, Officer Thomas, testified on direct examination when looking at the photograph that he thought the stain was blood, and so this, of course, raises a critical issue in the case as to self-defense, because that could lead the jury to believe that my client, the defendant, had aggressively struck her during the melee that happened in the truck that evening, and so it was the defense's position at trial that this was actually cafe mocha that the decedent had thrown all over the truck. So that's how this issue arose. Didn't the state concede that point in closing argument? Didn't they say that, of course, this was cafe mocha on her cheek, and that then supported your theory that your client acted in self-defense? I don't believe they did. I believe that there was extensive argument from the defense on this point as to whether it was cafe mocha or blood, but there was testimony actually from two officers during the trial. One was Officer Thomas, and another was the forensic investigator, Neeson, who said that they believed that this, in fact, was blood, and because of that, that's why this issue arose, because of the self-defense in the case. Weren't they rather equivocal about whether it was blood or something else and didn't really know, and it's undisputed that there was cafe mocha all over the truck? It was on your client. Perhaps it was on the cheek, but my understanding of the record is that the state conceded that there was cafe mocha all over the car. It wasn't swabbed. There was no need to swab it because common sense tells you it's cafe mocha, so why would they swab her cheek for it? So, in other words, the state is saying it's cafe mocha. Who cares if they said it could have been blood or it might have been blood? Nobody argued that your client hit her, did they? They did not, and you're correct, Justice, that the state conceded that cafe mocha was all over the truck. The difficulty here is they put on two witnesses who testified to the jury that this, in fact, looked like blood, and because this was a self-defense case, it directly impacted the affirmative defense of self-defense because, as your honors know, you cannot have self-defense if you were the aggressor. Mr. Baker, I want to take it another direction because I probably agree with you that it was error not to allow the instruction, but it would be harmless error given the overwhelming evidence that this was not self-defense. Well, Judge, I disagree with the state's argument that this was, in fact, harmless error because I think the prejudicial effect it had because the jury was not able, without the instruction, to construe that this evidence could have been adverse to the state. There was numerous evidence that my client that he was, in fact, defending himself at the time. But you were claiming self-defense in a situation where, based upon my reading of the record, the only aggressive act was her grabbing the steering wheel, and that doesn't get you to a shot in the face. And that I would disagree with as far as the facts. That was what the state argued in their brief, that the only act she did was grab the steering wheel. That was not accurate. She also started screaming at the defendant. She hit him. Screaming at him? Grabbing the steering wheel and screaming at him. Continue. She hit him repeatedly with her water bottle in the head. Hit him with a water bottle. Okay. Shot in the face. It was very cold out at the time, so the water bottle would have been a weapon. He had marks on the back of his head. So I've got a weapon in my hand now. This is Taylor's bottle. I'll grab my own bottle. Well, according to the- Do we know what kind of water bottle it was? Do we know in the record? I don't, Judge. But also, they did look at him at the time, and he did have bruises on the back of his head from being hit. He also had a chipped tooth from the attack. And as I said, he lost control at the time. He was driving 65 miles an hour at night on the road, being attacked, and he couldn't see out the window. So you believe that that justified the shooting? I believe that it justified a self-defense, affirmative defense claim. Well, self-defense has to be reasonable, too, though, right? It does, but that's up to the jury. And if they thought that he, in fact, had struck her during the melee, they could say that he was the aggressor, because an aggressor- So your entire argument is premised on the notion that the state put this evidence out there, that the victim had blood on her cheek, never proved it up, but then it was just left out there for the jury to think about when it was determining who was the aggressor here. And because there's this evidence out there that the jury could have reasonably concluded that that your client was the aggressor. Yes. Was there a contemporaneous objection when this testimony was elicited from the police officers? I don't believe that there was, but there was cross-examination on, then extensive cross-examination on whether this was blood or whether it was cafe mocha from the defense. And the reason we also think that an instruction was warranted in this case is based upon the Illinois Evidence Preservation Statute. There are numerous commentators that have said- It talks about biological evidence, right? So blood is a classic example, but- Correct. It is, and the statute- So your argument here is that you wanted the evidence preserved in a swab taken to exclude blood. Correct. Not to confirm the presence of blood. Is that right? It is exactly right. So that's what we're looking for. Has the statute ever been invoked in that manner? Not to my knowledge. It looks like the main case was People v. Grant, which was the Illinois Supreme Court case, but that was on a different topic. But clearly the statutory language here, the plain language says before or after trial, the officers have to maintain biologic evidence, and that is defined under the statute as blood. And there are numerous commentators that have talked about these evidence preservation statutes. And they, in fact, argue that where they are present when the police do not comply with them, that constitutes bad faith. And under the U.S. Supreme Court's case in Arizona v. Youngblood, this is exactly what they held, is that we would need to show bad faith in order to get- The state offering into evidence the information regarding the chocolate mocha or cafe mocha on the face, and that's why it became an issue later on in the trial. Yes, thank you. So one of the issues as to why an instruction should be warranted is that the state, in fact, is the one who introduced this on direct examination. It's interesting. And just to clarify, the instruction you were seeking was that the evidence, had it been preserved, would have been favorable to your client. That is correct. Is that the essence of it? Yes. The instruction would read, if you find that the state has allowed to be destroyed or lost any evidence whose content or quality are an issue, you may infer that the true fact is against the state's interest. So it was an adverse inference instruction that we were requesting. That's the key, at issue. Didn't the state say, common sense tells you it was cafe mocha. Why did they need to swab it? So the state did not ultimately argue there was blood on the face. He hit her. In fact, there was testimony that his knuckles were clean, right? So was it at issue? It was, Justice, because the state put it at issue on direct examination by eliciting testimony from Officer Thomas that it was blood. Otherwise, this wouldn't arise. That's why the entire instructional issue came up, because the state, in fact, introduced it. And in answer to Justice Walker's question, that was a distinguishing factor in Arizona versus Youngblood. There, they did not find bad faith because they said the state had not introduced the evidence. In that case, it was semen stains. In its case in chief against the defendant, it's opposite happened here. The state elicited testimony regarding blood from their own witness. So that put it in issue in the case. So then what's the adverse inference for the state that it was cafe mocha? The adverse inference is that it was not blood. That's what we're asking for, because that might show he was aggressor. And the record again shows that the state says it was. We concede it's common sense. So I'm having a hard time finding that it was at issue and that an adverse inference would have been anything other than what the state conceded at trial. Well, Justice, they did say that there was cafe mocha all over. But then why did they elicit testimony from their officer on direct examination that it was blood? Two officers testified that it was. That's correct. Two officers testified that it was blood during. They said they thought it was blood. Pardon? They said they thought it was blood. Yes, they said they thought it was blood. And you'll see not only did defense counsel, Mr. Wolf, do extensive cross examination on both of these officers, but there was lengthy argument in closing arguments regarding this. So it clearly became a critical issue in the case, according to the defense. You have five minutes left for your argument. Thank you. Turn to your second. Yes. Thank you very much. So the second issue that I'd like to address has to do with an evidentiary issue, and this is whether the trial court erred in denying the motion and eliminate to bar testimony that the decedent told several witnesses at the restaurant that night that the defendant was her stalker. This, of course, implicates Illinois Rule of Evidence 403 about there being. Would that be admissible as a motive or intent? It may. That's what that's what the state and the judge argued. I think it was actually introduced for the truth of the matter, which was impermissible propensity evidence. And so the question under the evidence rule is whether this was deprivative value was substantially outweighed by substantial president prejudice. Here there were two witnesses who said that the decedent told them that the defendant was her stalker. We think this was improper to put in in front of the jury because of the prejudice. A stalker is defined in Merriam-Webster's dictionary as a person who pursues someone obsessively and aggressively. Again, because this was a self-defense case, he the the defendant had to demonstrate that he was not the aggressor. And so by putting this evidence in front of the jury, it clearly led them to believe that he was the aggressor and he was the aggressor. And this was a part of the pattern to eventually kill the decedent. We think this was improper also because it led them to believe that there was something outside of the case to basically dirty up the defendant. This was a case didn't deal with what happened at the restaurant at all. There was no allegations that he was stalking the decedent at the restaurant or there was any problems at the restaurant. What about the phone? Didn't he take her phone into the washroom, search it, presumably, took it back out, snuck it back in her purse, takes it again, has second thoughts, put it back. Doesn't that give some indigestion of some behavior that would coincide with what the witnesses described how he was watching her, how he was quiet, how he was observing, how he leaned in when she was talking to others? I don't believe so, Justice, because this was something done in privacy area. These other women would not have known about this fact. And also that has to do with their own relationship. The issue here was not what happened in the restaurant. The sole issue legally was whether he acted reasonably in self-defense based upon her unprovoked attack in the car. That is the issue that... What about the 200 text messages between December 27th and January 1st? Yeah, that's true. They did have a lot of text messages. The defendant... 200 text messages from him to her. Yes. And he said that he had numerous phone calls and that this was a pattern they had in their relationship, but they would call back and forth. My point is... You've seen star 67 every time he called. Yes, that is what he testified to. But what I'm saying here is this is not the issue before the jury was basically tainted by having my client described as a stalker when the issue was what happened for the unprovoked attack in the car. That was a sole legal issue the jury needed to look at. This was clearly put in as propensity evidence. It was improper to dirty up my client, and I think it had an adverse impact upon the jury's consideration of whether he was the aggressor. The only thing the jury should have considered is whether my client's acts were reasonable based upon the unprovoked attack in the car. Your argument is that you really can't separate the... It's hard to separate what the state says the evidence was offered for, which is motive versus the truth of the matter asserted. That's what your argument boils down to, right? That's correct, Justice. Basically, they put in the fact that he was a stalker for the very reason of the truth matter asserted. They wanted this as propensity that he was a stalker, and therefore, he must have acted aggressively when he shot the decedent. So, that is precisely our argument. If there are no further questions, I think my time is just about done. So, thank you very much. Counsel, it was not an abuse of discretion for the trial court to not give the non-IPI instruction that the defense asked for. I think a place to start is the whole point of jury instructions. Jury instructions are to provide the jury with the correct legal principles to apply to the evidence. And to that end, Illinois pattern instructions should be used whenever possible when they accurately state the law. And non-pattern instructions should only be used if the pattern instructions do not contain an accurate instruction. So, the instruction that the defense asked for was this non-pattern instruction for how the jury should consider that substance that was on the victim's face. And as Justice Gamreth pointed out, the adverse inference would be that the substance on her face was cafe mocha. So, if we can back up a little bit and have an understanding of this cafe mocha. So, a part of the facts that counsel elicited did not necessarily reflect some of the history between these two 50-year-old adults who did not live in the same home. And when the defendant wanted to go out with the victim, he wasn't allowed to pick her up at her house. He had to meet her at a separate location where she could then get in his car. She didn't want him to come to her house. And that night, yes, they had been dating for two years and had been involved in this relationship that was tumultuous. This relationship that was plagued by jealousy and distrust. And as your honors were just pointing out, during the week prior to this New Year's Eve celebration, the defendant called her 216 times. And the victim had blocked the defendant, as he acknowledged, had blocked the defendant for the last five months from texting her. And the reason from his testimony was that he was saying, I love you too much. So, she had blocked him. And so, the only way that he could reach her was to either email her or call her. And in one of those emails in the days prior to this New Year's Eve, he said, he emailed her and said, I thought you weren't going to go out on New Year's Eve. I thought you had plans. As you know, I wanted to go out with you. And her response and his testimony was, with persistence, she agreed to go out with him. So, on that New Year's Eve, she parked her car at Panera, picked her up at 4.30, 4 o'clock in the afternoon, and agreed to go with defendant to the California Pizza Kitchen. Now, the defendant- Panera is where they got the cafe mocha. I'm sorry. Yes. When she parked her car at Panera, he went in, and in his efforts to stay in good graces or succeed in this relationship with her, he got three cafe mochas, one for himself, one for her, and one for her in the morning. So, these full cafe mochas are in the car. So, after he went to the Chicago California Pizza Kitchen, they had dinner, they went to play darts, and they first were going to go to the Donkey Inn, and they didn't have darts, so they end up at Bullseye. And the unique thing in this case for the jury is you can see through all the video cameras that were on at Bullseye, you can see relationship between the two, and the dynamic in between the two of these. This is a video that the jury saw. Thank you, Your Honor. Yes, video. You could see the video of the two of them playing darts. You could see the video of the two of them going in and out because they went out to smoke a cigarette, and they would come in. You could see the two of them, she's drinking more than he is, and people are buying her shots. One of the women that goes to this second issue of whether or not one of the women who testified about this statement coming in that he's a stalker was a woman who saw her and said she seemed to look sad. And this was in 2020 during the pandemic, and this stranger to the victim invited her over, invited her for a shot and said, 2021 is going to be a great year. And that's in that conversation, that little bit of instance when she says, it'll be a good year as long as I'm not in my relationship with him. He's a stalker. But the thing about that comment, it fell flat with that witness who testified because that witness said she didn't take anything from it. And when the victim said it, it was accompanied by an eye roll from the victim, which kind of signifies an annoyance. It doesn't signify that she's afraid of him. All it is is her characterization of how she sees the relationship and how he sees the relationship. And that antagonism is important. That antagonism for the state offers this evidence motive, not for the truth of the matter asserted. Is that right? That's correct. And how do you respond to counsel's argument? Mr. Becker's argument that it's, this is really propensity evidence at the end of the day. It is not propensity evidence because it was offered as, as the court indicated to illustrate that and to motive and intent and to illustrate the antagonism and the conflicting nature of that relationship. And so it was not offered as propensity also because of, there was so much other evidence that came in outside of those two statements. The second statement was to a bartender who the, who the victim and the defendant knew because of their relationship together. And they had gone to restaurants where that bartender knew during their two years together. I believe the bartender said she'd seen them together approximately 20 times. So in terms of evaluating the prejudicial effect of the statement and whether it was propensity, it wasn't, she wasn't afraid of him. Um, there was other evidence that came in that, uh, uh, essentially makes your argument is that it wouldn't have had the same, uh, effect as if these folks had not known each other, because despite the fact that she called him the defendant, a stalker, they still continued to go out occasionally. Correct. It's not like she was saying, see that man at the end of the bar, he's my stalker. I don't, I don't know them. She, it wasn't necessarily an indication of fear. It was an indication of how the antagonism in the relationship, I'm sorry. And I went into the second argument and I initially started on the first. Well, I thought you were just giving the facts. That's why I kind of went back a little bit, but the whole thing by him being seen as a stalker that totally defeats his self-defense argument. And that's what counsel is arguing. That's what, that, that creates a problem. And it's evidence that was clearly admitted for the truth of the matter asserted. I would respectfully disagree. Um, and even if you were to think that in light of, I would say it was harmless error because in the end, in light of the other evidence that was going to come in, there's no way that the jury, even taking out those two, um, brief instances of referring to the defendant as a stalker, as to how she sees her relationship with him. That absolutely was not needed in this case. Not at all. But, but, but it was solicited and it defeated his self-defense argument. Respectfully when the judge, the question is whether or not judge Cataldo abused his discretion when he, he let that, um, those two fleeting references in. And when he was making that decision, he had all sorts of other information in front of him and information of the 216 phone calls, all sorts of, and his, his actions and her responses. So when the judge made the decision to allow those two fleeting comments in, it was to illustrate, um, the antagonism and because it was relevant as to motive and intent. And because it was relevant as to motive and intent, it wasn't necessarily as, uh, the prosecution argued to rebut self-defense, but it was relative, uh, I'm sorry, it was relevant to illustrate motive and intent because his motive and intent was something that was going to be at issue. At issue was going to be always whether or not he acted reasonably, because you can only be justified in the use of deadly force. If you reasonably believe that deadly force is necessary to prevent imminent death or great bodily harm to you. So the jury was always going to have to determine whether or not he acted reasonably. So these two fleeting references to he's not my boyfriend, he's my stalker hails in comparison to all of the other evidence and is insignificant. And the defendant himself described himself with respect to the phone, um, taking the phone from her purse and taking it into the bathroom and looking at it. He himself says he's delusionally jealous and I was being paranoid. So, and he explained a way, um, how stalker in his testimony was a term of endearment that she said it in a loving way at one point in their relationship with him present. Uh, he said, yeah, she refers to me as her stalker. So any prejudice he himself explained away and minimized, but unless there are any questions on the second, I'll get back to the first before I run out of time. Um, with respect to, uh, the jury instruction, um, the jury instruction that the defense asked for, uh, did not fit what, what was an incorrect statement of the law. Is that what you're saying? I'm not saying that because it was in a Supreme court case. So it came from a concurring opinion. So that's not it. It's just that the facts in this case didn't fit because in order for those, the facts of this case to fit, um, first it wasn't abuse and abuse of discretion for the trial court to think that the police violated their own standards and procedures. Because when this instruction had been used in the past in Danielle, in the Danielle case, the police did, um, operate outside of their own police procedures. In that case, it was a sexual assault case. And the issue was whether or not there was consent and, um, the defendant in that case had gotten rid of a pair of underwear. Um, someone had called the police, the police recovered that underwear and, um, the victim was able to get her underwear, that pair of underwear back, and then she destroyed it. So the police in Danielle were not operating within their own standard procedures because obviously that underwear, in this consent case, the question was whether or not they were torn. So that underwear obviously was significant, could not be, um, uh, replaced by anything else. And the police operated outside of their own standard procedures. Whereas in this case, the question is, were the police operating outside their own, um, standard procedures? And the answer to that is no. All of the testimony was, and it wasn't an abuse of discretion for Judge Cataldo to find, that the police did not see anything significant in swabbing this alleged... But to, let's just change, just to go back a step for a second, because two officers testified that they thought it was blood. And so if it were, if the jury believes then that there was blood on her face, that means that either he did something to get the, to cause the blood to be on her face. And that's where the problem comes in, that the state solicited that information and now it makes it seems that he's the initial aggressor and his testimony is that he wasn't. And not to add on, but I am going to, um, that in combination with, um, the stalker, um, testimony, um, goes right to the heart of who was the aggressor here, right? I mean, so, uh, maybe individually they may not be enough for a new trial, but cumulatively, is it enough for a new trial? Well, I can understand what you're saying, because in either case, the question is whether or not the trial court abused its discretion. And so with respect first to the substance that is on her face that the two police officers, um, commented, the first was a patrol officer who when shown a photograph said, what do you see there? And he said, looks like blood. That was significantly diminished on cross-examination by a very skilled defense attorney. But why, but why did the state even put that out there? I mean, it's not relevant, right? It wasn't, but honestly, blood is a scientific conclusion. And so to say something looks like blood, but if a police officer says it looks like blood, I mean, what's the jury to think? Um, before they saw the photographs themselves, that's absolutely correct. But then when the photographs were available and made available and they could see it as we've all seen, there's a absolute difference between the blood that you can actually see coming out of her nose and this staining on her face, which is as was argued at trial, which was way more consistent with the cafe mocha that was throughout the car. So the redness in, um, the actual blood on her face that everyone can use their common sense to see, and this brown staining, which was way more consistent. And so that did support as the prosecutor argued in closing argument, it's cafe mocha. So those comments by those two witnesses, again, extremely, um, diminished by the significant cross-examination, um, and were those comments drawn out by general questions or as opposed to, is that blood? Correct. General questions. What do you see that you see here's people's exhibit nine. What do you see in that photograph? I see this and something looks like blood. And then that was the wrong thing to say. And I'm sure that patrol officer, and then admittedly it was later on in evidence, um, technician who also said it, but both of those, both of their testimony was, um, diminished also by the remaining physical evidence, obviously, as justice Gamreth, um, pointed out, there was no evidence on their hands of any injury. There was the state itself did not make any argument of any physical altercation outside of welfare being shot. Um, but the, the evidence of the altercation was throughout, and it was this cold cafe mocha that was throughout the car. I'm sorry. There was also the, um, when he at the scene did say that he had suffered an injury to his, to the back of his head, it wasn't bruising. It was a minus, well, my characterization, it was a small laceration that the police took photographs of and preserved. Was there any, um, a defendant testified that he discovered a couple of days later to a chip tooth. Yes, he did. But that wasn't reported at the time. It was not reported at the time. So, and the jury received that information. It was not kept from them. The jury received that information and still did their balancing because in the end, what they were going to is whether or not he acted reasonably and minutes. Um, and so I think that what's important in this case is, uh, actually, I'm sorry. Um, you have seven minutes. Oh, um, okay. Thank you. I think that, uh, what's important is again, looking at the trial courts decision-making and whether the trial courts, um, when it exercised its discretion, whether it was arbitrary, fanciful or unreasonable, because that's what an abuse of discretion is. And when the, um, when the judge was evaluating whether or not to give this non-pattern instruction to be guided by, well, is there a pattern instruction that works? Because non-pattern instructions should only be given if there isn't a pattern instruction. And here, the arguments that the defense wanted to use that instruction to illustrate their theory, and their theory was that she started it. She started, um, Christina was full of chaos and that she started it. And so the, um, attorney was able to use a pattern instruction that fit. He didn't need this lost and destroyed evidence instruction, this non-pattern instruction, because the attorney was able to use the circumstantial evidence instruction. And that circumstantial evidence instruction allowed him to ground his theory of the case that she created. Just look at the circumstances of the, um, this big, uh, truck, I'm sorry, the cab of this pickup truck, and you can see chaos. So, um, there was this- Missing instruction or missing evidence type instruction is a lot more powerful than a circumstantial evidence instruction, isn't it? It is if it fits, but it doesn't fit. It didn't fit. It didn't fit the, um, um, it didn't fit the due process concerns that were there in Daniele. And again, this non-pattern shouldn't be used if there's a pattern that fits. I want to come back to the issue of the IPI, because, I'm sorry, of the non-pattern jury instruction. The court denied the opportunity, or the court allowed in all this extra evidence, and then at the end of the trial denied the defense the opportunity to provide this instruction, which you have just admitted was not an incorrect statement of the law. Correct. So, why wouldn't that be an error rather than, because there's two different, there's a different standard of view, as you know, whether or not we look at this as error, or whether or not we look at this as an abuse of discretion. And, of course, abuse of discretion is more deferential, and if it's an error, we take a different look at it. So, what do you believe it is? I'm going to ask counsel the same question. What is it, and what should be our review of this particular issue? An abuse of discretion and not an error, because I still don't think that the police acted outside of their normal procedure, and the judge didn't find that they did. And second, the fact that the substance, it's... But if the police think it's blood, why wouldn't they, doesn't procedure require that they test it? It doesn't mean that the police thought... You have a victim who died with a gunshot, I guess, at her nostril, is that right? The gunshot wound was to the back of her and it didn't actually exit out. So, the fact that there's blood is not a surprise to anybody, but the question is whether or not... Because they wanted, their inference that they wanted to draw, their theory of the case was that it's cafe mocha. And so, some officer who offhanded is looking at a photograph does not equate to what the police did at the scene, and what was in question. The cafe mocha that was apparent to everyone on the scene did not have any evidentiary value or any significance. I'm sorry. I thought you were going to... And Daniele, isn't it true that the state actually argued the evidence and said the torn underwear was evidence of defendant's guilt? Here, it's my understanding from the record, you didn't argue that this was blood, that this was evidence that he ever struck her or did anything like that. And again, I get back to the point of the adverse inference is it's coffee, and in fact, the state stood up, told the jurors it's coffee. Absolutely correct. Thank you. And so, I'm not sure of my time. You have one minute. If I could just summarize, the trial court in this case had all of this information before it, and was absolutely within its discretion, first, with respect to the non-pattern instruction and deciding not to give it. And second, when it received this information of all of the history between the victim and the defendant, and whether or not to let in these two comments, the trial court was within its discretion when it allowed all of that evidence in. And for all of the reasons that I've offered and everything that's in our brief, we'd ask you to uphold the conviction. Thank you, Ms. Burns. And Mr. Becker, you have five minutes in rebuttal. I first wanted to address briefly the question of the non-IPI instruction. The state did concede that it was a correct statement of the law. It clearly was. It was used in Daniele and quoted by Justice Stevenson as a concurring opinion in Arizona v. Youngblood. But the state argued it was not an abuse of discretion, in this case, for the judge not to give that instruction. I believe that it was. When he denied the instruction, he specifically said, quote, the state did not use any possible brown stain as any evidence against the defendant here. That's from the record at page 1661. That was an incorrect statement of the law, because as Justice Walker has mentioned on several occasions here, there were actually two witnesses that testified that they thought this was blood on the decedent's face. But at the end of the day, the state conceded in closing argument that it's coffee. It's all over the truck. But then why did they introduce evidence in their direct examination? And this is a question, but didn't they concede that the stain on her face was cafe mocha? I mean, they basically claim that at the end to the jury. That's correct in the closing. But the damage was already done that you can't, as they say, unring the bell. They put this evidence out to the jury already. And whatever they claim later, it was already there and it already prejudiced the defendant in his self-defense claim. But was there anything other than sheer speculation that a juror might have thought she was hit and that caused blood? Is there anything in the record that anybody argued that? I think it's just sort of made up as to what one might speculate. We know there were two shots in her. We know that there was blood from her nose. The police officer said it wasn't significant. We had a dead body. We knew there were shots fired. He admitted shooting him. We didn't think we had a swab. There was coffee all over the place. So tell me about that, because I'm just really wondering how this is at issue. The reason, Justice, that they should have done the swab is because of the Illinois Preservation Statute. The statute has been around for almost a quarter of a century. The police were obviously aware of it because if they didn't follow it properly, they can be criminally responsible for a class war felony. This was never raised to Judge Codaldo. So here we are. We have an abuse of discretion standard. This argument was never made that they violated this statute. It wasn't raised at trial. But even if it was, again, was it so arbitrary, so fanciful? And unlike Daniele, where they actually argued the evidence, here you don't have the state doing that. But then why did the state put on indirect examination that it was blood? That was the state that did that. That put the issue in front of the jury. Wasn't the question more, here's exhibit X. Here's a photograph. What do you see in that photograph? And the witness described and said, it looks like blood on the face. Two witnesses actually described it as being blood, and this is a self-defense case. So this became the critical issue in the case, as evidenced by defense counsel's lengthy cross-examination and his closing argument, which went on for pages. This became the critical issue in the case. I would totally agree with you if the state said, clearly, he had hit her, he had abused her, there was this punching, there was something, but that was not what this record looks like. And in fact, your client testified, I never hit a woman. There was testimony his knuckles were clean. I just, again, help me find that connection where it's at issue, because that's really the question. Yes, so I think the connection is that the state talked about this being a non-IPI instruction. Clearly, there is nothing wrong with issuing a non-IPI instruction. The law is very clear that if there is some foundation in the evidence for an instruction, it should be given. Here, because the state put the evidence at issue by saying this was blood, the defense clearly had a right to have an instruction. A circumstantial evidence instruction is simply not satisfactory in this situation. So for us to agree with you, we need to find that this was so critical to your defense as to make this trial fundamentally unfair. Is that your argument? Yes, the argument, this is an abuse of discretion, because the defense had a right to present a defense. And then just briefly on the last issue, with respect to the statement about a stalker, please remember, this is not a case where he's being prosecuted for violation of a their argument on the motion in limine. The state said that the evidence should be allowed in because the statements were made right before the decedent was shot and would refute the defendant's self-defense claim. That demonstrates the state had a particular reason why they wanted the stalker information in. It was not because it was relevant to what happened in the car, it's because they wanted to have prejudicial evidence to make the jury believe that my client was the aggressor when he was not. Mr. Bricker, just for a second, if I were to say to you that I agree that the instruction should have been given, it was a correct statement of the law, and the state had provided some evidence that defeated his self-defense claim, so therefore the instruction was needed. And if I said to you that I agree with you that this, the two comments regarding stalking were, should not have been admitted, then where does that leave us? Because it's still, I still see just overwhelming evidence that I just, I struggle with. The only thing that I can recall is the grabbing of the steering wheel, then you named a few other things which I didn't think were important, but then you end up shooting in the face. So I struggle, or the back of the head, anywhere, shooting, period. I struggle with that. So how does that become reasonable self-defense? Well, the question, whether it was reasonable self-defense is for the jury, and if the jury was given prejudicial information that he was a stalker and that they were not instructed about the discussion. And they've ruled on it. The jury has ruled on it, though, right? So, yes, I agree with you is the question for the jury, and they've ruled. Right, but they did not have the proper instructions, and they were given evidence that they should not have considered. And I think both those errors cumulatively should lead the court to reverse my client's conviction and order a new trial. So if I agree with Justice Walker and say, true, maybe it shouldn't have come in, again, tell us your best description about how your client's was reasonable, necessary, proportionate to the perceived risk. My client was driving at 65 miles an hour at night in the truck. The decedent was hitting him. She was screaming at him, die, die. She did get in control of the steering wheel. She threw coffee mocha all over the car and my client's glasses and on the windshield, so he could not he lost control for a certain amount of time. He testified of losing control. Yes. For how long? He just said for a short period of time. Okay. And then when he was told to pull over, he had no problem seeing that didn't stop him. He pulled right over, correct? He eventually pulled off the expressway and got onto the off ramp. Yes. All right. So continue on those other facts as to why this was reasonable. Right. So those were the facts that he was basically, he felt his life was threatened at the time and he just reacted after he was being attacked and couldn't see why he was driving at 65 miles an hour. So that is an issue. Mr. Becker, I mean, even the best case scenario that you described, there are a whole host of alternative actions that your client could have taken in response to the situation that did not rise to the level of pulling a gun out and killing the victim. Yes, I would certainly agree with that, Justice. There were other alternatives. This is how he reacted. But then the jury could determine whether it was reasonable or simply he had an unreasonable belief and he could have been convicted of a lesser form of murder. So that was up to the jury. And I think these errors directly affected the decision of the jury. And therefore, ask that you reverse my client's conviction and grant him a new trial. Thank you, Mr. Becker. Thank you very much for your time. Thank you, counsel. I want to express my gratitude for the excellent briefs and excellent and zealous advocacy this morning. The case will be taken under advisement. The case is submitted. The court will stand in recess and we will go off the record now.